UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  04/04/2025
```

----------------------------------------------------------------------X
                      :

OSHOKE ABALU,                    :

                      :

        Plaintiff,      :

                      :         24-cv-5917 (LJL)

     -v-                 :

                      :       OPINION AND ORDER

SOCIETY OF HUMAN RESOURCE MANAGEMENT, :
JENNIFER MCCOLLUM,      :

                      :

        Defendants.    :

                      :
----------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Plaintiff Oshoke Abalu ("Plaintiff") brings this action *pro se* against Defendants Society

for Human Resource Management ("SHRM") and Jennifer McCollum ("McCollum" and with

SHRM, "Defendants"). Dkt. No. 40. Plaintiff alleges that McCollum fraudulently induced her

to enter into a marketing agreement with SHRM's predecessor and that SHRM is liable for its

predecessor's breach of that agreement and for misappropriating Plaintiff's trademarks, name,

image, and likeness in the inclusivity space. *Id.* McCollum moves to dismiss the complaint,

pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim for relief. Dkt.

No. 46 (incorporating Dkt. Nos. 16, 30). SHRM moves to dismiss the action, pursuant to Federal

Rule of Civil Procedure 12(b)(3), for improper venue, and, pursuant to Federal Rule of Civil

Procedure 12(b)(6), for failure to state a claim for relief. Dkt. No. 50 (incorporating Dkt. Nos.

19, 37).

For the following reasons, McCollum's motion to dismiss is granted. SHRM's motion to

dismiss is denied. However, the Court finds that venue in this District is improper as to

Plaintiff's claims against SHRM and will transfer the case to the Eastern District of New York

pursuant to 28 U.S.C. § 1406(a).

## BACKGROUND

For the purposes of this motion, the Court accepts the allegations of the *pro se* amended

complaint as true and "construes [them] broadly and liberally, interpreting them so as to raise the

strongest arguments they suggest." *Genao v. City of N.Y.*, 2021 WL 2111817, at *2 (S.D.N.Y.

May 25, 2021).[1]

## I.    The Parties

Plaintiff is an individual who resides and is domiciled in Brooklyn, New York.  Dkt. No.

40 at 2.[2]  She developed "Redesigning Inclusion as Superpowers & Symphony" ("Superpowers

& Symphony," or "Symphony"), her unique framework for inclusion, which recognizes and

---

[1] Defendants argue that Plaintiff should not receive the solicitude afforded *pro se* litigants, because she had the assistance of counsel in drafting her complaint. Dkt. No. 16 at 10; Dkt. No. 19 at 12.  That principle of law has been applied when motions are directed to complaints that indisputably were entirely drafted by counsel. *See Atencio v. U.S.P.S.*, 2015 WL 7308664, at *4 (S.D.N.Y. Nov. 19, 2015) (denying application of *pro se* standard when plaintiff "expressly acknowledge[d] that she was assisted by an attorney"); *Weican Meng v. Xinhuanet Co.*, 2017 WL 3175609, at *2 (S.D.N.Y. July 25, 2017) (denying application of *pro se* standard when complaint was drafted by retained counsel, who then withdrew); *see also Tracy v. Freshwater*, 623 F.3d 90, 102 (2d Cir. 2010) ("[W]hile a pro se litigant should ordinarily be afforded a substantial degree of solicitude, the exact degree thereof will depend upon a variety of factors."). In this case, however, it is unclear whether, or to what extent, Plaintiff received assistance of counsel in drafting the operative pleading.  Plaintiff's complaint acknowledges that she previously retained counsel, and SHRM submits that Plaintiff "emailed an almost identical draft of [her initial complaint] in March 2024 to SHRM's most senior leadership, with the draft indicating it had been prepared by counsel." Dkt. No. 19 at 12.  But Plaintiff has since amended her complaint, and there is no indication the amended complaint was prepared by counsel.  Dkt. No. 40.  Even the draft sent to SHRM in March 2024 was undoubtedly sent by Plaintiff herself, Dkt. No. 18-1, suggesting Plaintiff was not represented at that time.  Finally, Plaintiff's briefing on these motions has not been prepared by counsel.  The practice of construing the allegations of the complaint liberally "to raise the strongest arguments they suggest," does not protect against only unartful pleading by a *pro se* litigant in an initial complaint. *Genao*, 2021 WL 2111817, at *2.  It also protects against the possibility that because of the litigant's lack of knowledge regarding later steps, such as amending the complaint in response to a motion to dismiss or highlighting important allegations in her briefing, she may forfeit a meritorious claim.  These considerations justify affording Plaintiff solicitude here.

[2] The paragraph numbering in Plaintiff's complaint is repetitive in several locations.  Because the paragraph numbers therefore do not identify unique allegations, citations to the amended complaint use page numbers.

champions each person's uniqueness as "Superpowers"—thereby unlocking "Symphony" as the practice of inclusion that helps people shift focus from what separates them to what unites them. *Id.* at 3.  She is the owner of a registered trademark in the mark SUPERPOWERS & SYMPHONY, Reg. No. 6,440,305, for, *inter alia*, workshops, seminars, and education services in the field of inclusion and organizational development.  *Id.*  She has been recognized as a Crain's 40 under 40 honoree, a Designer to Know, and an IIDA Design Pioneer; she is a teacher on LinkedIn Learning; and her work is discoverable through TEDx, Fast Company, TIME, Smart Planet, and Real Simple Magazine.  *Id.* at 4.

SHRM is a Virginia nonstock corporation headquartered in Alexandria, Virginia.  *Id.*  It is a professional human resources membership association that claims to provide education, certifications, networking, and lobbying services to its members.  *Id.*  In 2022, it acquired Linkage Inc. ("Linkage"), which provided similar services, and Linkage was thereafter rebranded to "Linkage, a SHRM Company."  *Id.*

McCollum is an individual residing and domiciled in Chevy Chase, Maryland.  *Id.* at 10. She is the former CEO of Linkage.  *Id.*  She specializes in "inclusive leadership" and "empowering women and people of color."  *Id.*

## II.    Initial Dealings Between the Parties

Plaintiff first met McCollum on June 4, 2020, when Plaintiff was a speaker on the future of inclusion during a Marshall Goldsmith 100 Virtual Conference. *Id.* at 15.  After hearing Plaintiff speak, McCollum informed Plaintiff that she wanted Linkage to participate in a meaningful way in the Black Lives Matter movement and asked Plaintiff for her help and support in achieving that goal.  *Id.*  At the time, Linkage had not used the terms "Redesigning Inclusion" or "Superpowers & Symphony" in its inclusion programs and had no people of color working for it.  *Id.*

3

McCollum was encouraging to Plaintiff.  She wrote Plaintiff in August 2020 that she "love[d] the idea of creating something that can also be used to promote your important work," *id.* at 16, and she discussed a collaboration in which Plaitiff would hold the aspiration, vision, language and pictures of Symphony, while Linkage could operationalize it, *id.* at 16–17.  She suggested that they could "create digital development that combines our voices and perspectives" and share the resulting revenue.  *Id.* at 17.

After a vision meeting with Linkage, Plaintiff agreed to contribute her influence, credibility, and intellectual property in the inclusivity space to Linkage on a project-by-project basis to create human-centered programs for which she would be compensated.  *Id.* at 15–16.   In return, Linkage agreed to contribute various talent at Linkage (including McCollum) as well as its sales, marketing and delivery engine, ability to create and commercialize intellectual property, and foundational competencies including operations, customer service, project management, and quality assurance and control.  *Id.* at 16.

The mutual understandings of Plaintiff and Linkage were initially reflected in a document titled "Oshoke, Jennifer, and Linkage: Our Vision Forward" ("Vision Document") written by McCollum and Plaintiff in September 2020.  *Id*; Dkt. No. 40-2.  The Vision Document contemplates Plaintiff, McCollum, and Linkage working with one another to develop a training and development product based on "Symphony, A New Blueprint for Radical Inclusion," to advance women and people of color in the workplace and in positions of leadership.  Dkt. No. 40-2.  One of the goals of the collaboration was to help McCollum achieve success as a turnaround CEO by 2022, with a return to profitability by 2022 and the sale of Linkage by 2023. *Id.* at 3.  The vision for Linkage included:

- The Oshoke/Linkage collaboration has created strong demand and feedback for our unique perspective and products.

- Based on our brand and Superfriends, heads of DEI and heads of business proactively reach out to us to learn more about how we can help their leaders and organizations transform.

- We have mapped our current and future products under a shared framework that makes it easy for leaders and organizations to understand, buy and receive our offering.

- We have products that significantly shift the hearts and minds of leaders and organizations, and have a product roadmap based on customer need/external voices.

- We have clear product build and delivery roles that honor our interests, needs and Superpowers, resulting in business growth and impact for both Oshoke and Linkage (e.g., which products are led in creation/delivery by Linkage vs Oshoke, depending on what is important to her)

- We are vocal and visible in our marketing and branding efforts about the collaboration/partnership with Oshoke . . . and we are actively promoting our collective voice and offering.

- Our inclusion Solution has resulted in a $5M pipeline in 2021, and we have doubled our Inclusion business to $2M in 2021, on a path to build a $10M by 2023.

*Id.* at 1 (ellipsis in original).

Plaintiff and Linkage then signed a letter agreement dated October 13, 2020, and executed on October 24, 2020. *Id.* ¶ 54; Dkt. No. 40-3. The letter agreement contemplates a collaboration integrating Plaintiff's blueprint for Superpowers & Symphony with Linkage's platform and products to "enhance the offerings of both parties." *Id.* at 24; Dkt. No. 40-3 ¶ 1. The agreement stated that the parties would debut their collaboration, titled "Superpowers & Symphony—The Future of Inclusion," at the 100 Leaders Live virtual event on October 14, and that the parties would "continue to engage with each other . . . in the next few weeks to further develop and align on roadmap and initial products." Dkt. No. 40-3 ¶ 2. An exhibit to the agreement provided an outline of potential product offerings, including immersive workshops led by Plaintiff and McCollum aimed at building cultures of inclusion, a one-hour Superpowers & Symphony "arts inclusive and interactive" virtual experience led by Plaintiff, an "Inclusive Organization Analysis" to discover an organization's "Symphony strengths and opportunities,"

and inclusivity development sessions for leaders and employees. *Id.* The parties agreed Plaintiff would contribute her name, voice, brand, and intellectual property on a project-by-project basis, and Linkage would contribute product development, creative design, marketing, sales, delivery, and administrative support to the venture. Dkt. No. 40 at 25; Dkt. No. 40-3 ¶ 3(b), Ex. B. Plaintiff was defined as an independent contractor and retained all rights to her intellectual property, name, voice, likeness, and works including "Symphony" and "Superpowers & Symphony." *Id.* ¶ 4. Linkage retained control over its own intellectual property. *Id.* Both parties would have "approvals over any product or service that uses their respective offerings." *Id.* ¶ 5. They also agreed on a simple fee sharing structure for fees received from their venture. *Id.* at Ex B.

Plaintiff alleges that she performed under this contract. An email from McCollum regarding the Superpowers & Symphony debut presentation described "overwhelmingly positive feedback." Dkt. No. 40 at 17. A March 2021 email from McCollum stated that she was "in complete awe and admiration" of Plaintiff's focus. *Id.* at 21. Plaintiff introduced and connected Linkage with key leaders and decisionmakers at a number of companies, brought in her close colleagues to improve Linkage's staff, consulted regularly with McCollum on strategy and served in a coaching capacity to several Linkage staff members, helped transform Linkage's stale and outdated visual concepts around inclusion into dynamic, engaging visual presentations which were then incorporated into other Linkage marketing, and devoted over 1,000 hours to developing and delivering two complete training programs with over 20 hours of robust content. *Id.* at 26.

However, Plaintiff alleges that Linkage did not perform. By December 2021, Plaintiff realized that Linkage had failed to deliver on its agreement to commercialize her intellectual

property.  *Id.* at 29.  For this reason, Plaintiff sought to "simplify her deal with Linkage" and focus on the two training programs the parties had already developed.  *Id.*  She stated she was not interested in collaborating on any further products.  *Id.* at 30.

### III.    Marketing and Development Agreement

Plaintiff and Linkage then signed a Marketing and Development Agreement dated June 6, 2022.  Dkt. No. 40-7.  The Marketing and Development Agreement replaces the October 2020 letter agreement, which the Marketing and Development Agreement stated was terminated.  Dkt. No. 40-7.  The Marketing and Development Agreement "govern[s] all of [the parties'] various marketing and development activities, intellectual property rights and obligations, lead passes and referrals, and other areas of collaboration."  *Id.*  Specifically, the Marketing and Development Agreement contemplates that the parties will cooperate in the marketing of the two training programs (the "Training Programs") they previously and jointly created from pre-existing intellectual properly individually owned by each of them: (i) *Leading Superpowers & Symphony: The Heart of Inclusion*; and (ii) *Redesigning Inclusion: Superpowers & Symphony Workforce Essentials*. *Id.* ¶ 1(b).  Linkage would deliver the Training Programs to clients in both standard and tailored forms as well as in various modalities that Linkage deemed appropriate in light of commercial considerations.  *Id.* ¶ 3(a).  "Notwithstanding the foregoing," Linkage agreed not to make any material changes to the content of the programs without Plaintiff's approval, which could not be unreasonably withheld, conditioned, or delayed.  *Id.*  The fee for delivery of the Training Programs would be set by Linkage.  *Id.* ¶ 3(b).  Linkage also had the right to enter into license agreements allowing clients to reproduce, distribute, and use materials from the Training Programs, in return for a fee negotiated by Linkage.  *Id.* ¶ 4.  Linkage agreed to pay Plaintiff a portion of gross revenues collected from the delivery and licensing of the Training Programs.  *Id.* ¶ 6.  Plaintiff agreed not to offer the training programs herself.  *Id.* ¶ 7(c).

As part of the Marketing and Development Agreement, Linkage agreed not to deliver keynote addresses based on Plaintiff's original Symphony and Superpowers & Symphony concepts. *Id.* ¶ 7 (a). Superpowers & Symphony and certain other works were defined as "Oshoke Pre-Existing Materials" which remained the sole property of Plaintiff. *Id.* ¶¶ 1(a), 8(a). Certain other materials used to create the Training Programs were defined as "Linkage Pre-Existing Materials" which remained sole property of Linkage. *Id.* ¶¶ 1(a), 8(b). The Training Programs and Training Materials used in the programs, which incorporated both Plaintiff's and Linkage's pre-existing materials, were agreed to be joint property of the parties. *Id.* ¶¶ 1(a), 8(c).

The Marketing and Development Agreement was to remain in effect as long as Linkage continued to use the Training Materials, or until the agreement was terminated. *Id.* ¶ 10. The agreement could be terminated unilaterally in the case of a material breach if not cured within thirty days of written notice thereof, or it could be terminated by mutual agreement. *Id.* ¶ 11. In the event of termination, Linkage agreed to discontinue use of the Training Materials except with respect to pre-existing client commitments. *Id.* ¶ 11(c). Linkage was also prohibited from using Plaintiff's story, name, likeness, voice, or persona after termination. *Id.* ¶ 11(d).

The agreement provides that either party may freely assign its rights and obligations to an affiliated entity or any entity into which it is merged or consolidated, if the assignee assumes the obligations of the assignor in writing and there is no material adverse effect on the other party. *Id.* ¶ 15. In all other circumstances, assignment of the agreement requires prior written consent. *Id.* The terms of the agreement "shall be binding upon and inure to the parties hereto and their respective heirs, successors, permitted assigns, and legal representatives." *Id.* The agreement is governed by the laws of Massachusetts. *Id.* ¶ 16.

IV.    **Further Dealings Between the Parties**

After Plaintiff signed the Marketing and Development Agreement, Linkage did not comply with its contractual obligations under that agreement.  Dkt. No. 40 at 33.  It did not compensate Plaintiff as agreed and did not promote and sell the Training Programs the two had jointly developed.  *Id.*  Instead, Linkage created replica programs with similar titles using the keywords "Redesigning Inclusion," namely ""Redesigning Inclusion: Becoming an Inclusion Champion for the Workforce" and "Redesigning Inclusion: Becoming an Inclusion Champion for Leaders."  *Id.* at 33–34.  These programs integrated Plaintiff's Pre-Existing Materials and Plaintiff's approach, methods, insights, and language.  *Id.* at 33–36.  Linkage did not compensate Plaintiff for the use of her materials or approach or methods and did not ask for her approval.  *Id.* at 34–35.  Linkage deemphasized the Training Programs in favor of these replica programs, for example by placing the Training Programs below the replica programs on Linkage's website.  *Id.*

SHRM has stated that Plaintiff did not originate the idea of "Redesigning Inclusion."  *Id.* at 39.  However, in a press release dated February 17, 2021, Linkage described "Redesigning Inclusion: Workforce Essentials" and "Redesigning Inclusion: The Workshop and the Keynote" as new products emerging from its collaboration with Plaintiff.  *Id.* at 36.

Linkage also incorporated Plaintiff's contributions, insights and methods into its Excellence in Sponsorship Program without compensation.  *Id.* at 36–38.  Specifically, the Excellence in Sponsorship program incorporated components of the SEE model, which was part of one of the Training Programs.  *Id.* at 36–37.  Linkage and Plaintiff developed the SEE model jointly.  *Id.* at 37–38.  In response to Plaintiff's demands, Linkage agreed to remove the SEE model and mention of the SEE model from certain programs.  *Id.* at 38.  However, it did not do so.  *Id.*

On July 5, 2023, Plaintiff provided notice of termination of the Marketing and Development Agreement, claiming it had been breached. *Id.* at 39. However, notwithstanding the termination, SHRM continued to use Plaintiff's mark on its website and social media sites without authorization. *Id*. SHRM's "Redesigning Inclusion" webpage listed "Superpowers & Symphony" as one of its approaches to redesigning inclusion and included several additional references to the concept. *Id.* at 40. SHRM used Plaintiff's mark in connection with marketing its competing inclusion training programs to potential clients, and it has been offering the same services that Plaintiff offers under the mark to the same target audience to whom Plaintiff markets her services under the mark. *Id.*; *see also id.* at 9, 22–23. In addition, Linkage and SHRM have continued to use Plaintiff's name, image and likeness without authorization. *Id.* at 40–43. For example, Plaintiff appeared as an adviser on Linkage's website, several Youtube videos hosted on Linkage's account featured Plaintiff, and Plaintiff's name appeared on SHRM's website with a statement that Superpowers & Symphony was created "in partnership" with SHRM. *Id.* at 42–45.

Plaintiff has received two royalty payments from Defendants: one for $6,487.50 at the time the Marketing and Development Agreement was executed and another for $3,498 after she sent a letter to SHRM terminating that agreement. *Id.* at 46.

Plaintiff alleges that "[b]y partnering with Plaintiff, a cutting-edge black inclusion innovator, trading on her race, name and influence, and by coopting her intellectual property including her Superpowers & Symphony program as their own as the backbone of their offering, Defendants achieved instant credibility in the inclusivity space, obtained access to the enormous business opportunities of 'Inclusion', enhanced their brand, increased their valuation and became more attractive for acquisition." *Id.* at 22. Plaintiff further alleges that "Defendants benefited

from the sale and acquisition of their company by exploiting Plaintiff and her initiatives without consideration or compensation to Plaintiff to reach their primary goals as expressed in their Vision Statement." *Id.* at 23.

## PROCEDURAL HISTORY

Plaintiff initiated this case by complaint filed on August 5, 2024.  Dkt. No. 1.  Plaintiff alleged five claims for relief: (1) federal trademark infringement in violation of 15 U.S.C. § 1114, *id.* ¶¶ 114–126; (2) federal unfair competition and false designation of affiliation in violation of 15 U.S.C. § 1125(a)(1)(A), *id.* ¶¶ 127–133; (3) breach of contract against SHRM, *id.* ¶¶ 134–140; (4) "fraudulent inducement/promissory fraud" against McCollum, *id.* ¶¶ 141–148; and (5) violation of New York Civil Rights Law § 51 against SHRM, *id.* ¶¶ 149–155.

On October 10, 2024, each of SHRM and McCollum moved to dismiss the complaint. Dkt. Nos. 15, 17.  McCollum moved to dismiss the complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim for relief.  Dkt. No. 15.  She filed a memorandum of law in support of that motion.  Dkt. No. 16.  SHRM moved to dismiss the action, pursuant to Federal Rule of Civil Procedure 12(b)(3), for improper venue, and, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim for relief.  Dkt. No. 17.  It filed a memorandum of law and a declaration of counsel in support of that motion.  Dkt. Nos. 18–19.

On November 7, 2024, Plaintiff filed a response to Defendants' motion to dismiss as well as a notice and declaration in opposition to defendants' motion to dismiss.  Dkt. Nos. 23–25. McCollum filed a reply memorandum of law in further support of her motion on November 21, 2024.  Dkt. No. 30.  On December 11, 2024, SHRM filed a reply memorandum of law in further support of its motion to dismiss.  Dkt. No. 37.[3]

---

[3] By order of November 20, 2024, the Court granted SHRM's motion for an extension until December 11, 2024, to file its reply memorandum.  Dkt. No. 29.

Plaintiff filed an Amended Complaint on December 31, 2024. Dkt. No. 40.[4] The Amended Complaint asserts the same five claims asserted in the initial complaint. *Id.* It also adds a claim that SHRM is liable as a successor-in-interest to Linkage. *Id.* at 64–67.

Each of SHRM and McCollum then filed letters asking to file three-page addenda to their previously-filed papers in support of their motions to dismiss but otherwise to stand by those papers. Dkt. Nos. 41–42. The Court granted them permission to do so and stated that "[t]he Court will consider the motion to dismiss the initial complaint and the three page addendum as a motion to dismiss the amended complaint." Dkt. Nos. 43–44. It also directed that Plaintiff would have until January 28, 2025, to file responses and that Defendants would have until February 3, 2025, to file reply letters in further support of their motions. Dkt. Nos. 43–44. SHRM and McCollum each filed letters in further support of their motions to dismiss on January 14, 2025. Dkt. Nos. 46–47. Plaintiff filed a letter response in opposition to the motions on January 24, 2025. Dkt. No. 50. SHRM and McCollum filed reply letters in further support of their motions on February 3, 2025. Dkt. Nos. 55, 57.

## LEGAL STANDARD

In considering a motion to dismiss pursuant to Rule 12(b)(6), a court must "accept the material facts as alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Phelps v. Kapnolas*, 308 F.3d 180, 184 (2d Cir. 2002) (citing *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994)). However, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When adjudicating a motion to dismiss under Rule

---

[4] At a conference on December 13, 2024, the Court gave Plaintiff leave to amend her complaint by January 3, 2025. Dkt. No. 48 at 18.

12(b)(6), the court considers not only the well-pleaded allegations of the complaint but documents incorporated by reference and "matters of which judicial notice may be taken." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *see Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 382–83 (S.D.N.Y. 2020).

When a pleading alleges fraud, Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). In order to comply with Rule 9(b), "the complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

The Court is obligated to construe pro se pleadings broadly and liberally, interpreting them so as to raise the strongest arguments they suggest. *See Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007); *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 146 (2d Cir. 2002); *Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir. 2000). However, while the Court construes pro se pleadings liberally, this does not relieve pro se plaintiffs of the requirement that they plead enough facts to "nudg[e] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Nor does it relieve them of the obligation to otherwise comply with the pleading standards set forth by the Federal Rules of Civil Procedure. *Saidin v. N.Y.C. Dep't of Educ.*, 498 F. Supp. 2d 683, 687 (S.D.N.Y. 2007); *see Locicero v. O'Connell*, 419 F. Supp. 2d 521, 525 (S.D.N.Y. 2006).

## DISCUSSION

SHRM moves to dismiss the Amended Complaint on the grounds that Plaintiff fails to properly allege venue. Dkt. No. 19 at 8–10; Dkt. No. 50 at 1–2. SHRM also argues that the Amended Complaint fails to state a claim against it because Plaintiff fails to plead (i) a basis for

successor liability as to SHRM, Dkt. No. 19 at 11–12; (ii) that SHRM or Linkage violated any contractual obligation, *id.* at 13–18, (iii) that use of her mark was without her consent or caused a likelihood of confusion, *id.* at 18–23; or (iv) the required elements of a claim under New York Civil Rights Law § 51 (which is barred in any event by the applicable statute of limitations), *id.* at 23–24.  McCollum moves to dismiss the Amended Complaint on the grounds that it fails to adequately plead: (i) an actionable material misrepresentation or false promise, (ii) scienter, (iii) reasonable reliance, or (iv) fraud damages.  Dkt. No. 16 at 11–25; Dkt. No. 46 at 2–3.

The Court concludes that Plaintiff has not stated a claim for relief against McCollum.  It also concludes that Plaintiff has not pleaded venue against SHRM in this District.  It therefore dismisses the claim against McCollum and transfers this case to the United States District Court for the Eastern District of New York.

## I.    Claims Against McCollum

Plaintiff alleges that she was fraudulently induced by McCollum's promises of meaningful impact, collaboration, and compensation to forego other lucrative opportunities, including a content development agreement with LinkedIn Learning.  Dkt. No. 40 at 55–63.  McCollum argues that Plaintiff has not alleged a claim for fraudulent inducement against her because (i) her alleged statements were nonactionable hopeful opinions; (ii) Plaintiff has not alleged scienter; (iii) Plaintiff has not alleged reasonable reliance; and (iv) the lost opportunities damages Plaintiff demands are not recoverable on a fraud claim.  Dkt. No. 16 at 2.

Whether framed as fraud, fraudulent inducement, or "promissory fraud," Plaintiff's claims turn on the same elements.  *See Nourieli v. Lemonis*, 2021 WL 3475624, at *6 (S.D.N.Y. Aug. 6, 2021).  "To state a claim for fraud or inducement under New York law, a party must allege material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff, and damages."  *Transnat'l Mgmt. Sys. II, LLC v. Carcione*,

2016 WL 7077040, at *5 (S.D.N.Y. Dec. 5, 2016); *see N.Y.U. v. Cont'l Ins. Co.*, 662 N.E.2d 763, 769 (N.Y. 1995) (describing the elements as "representation of a material existing fact, facility, scienter, deception and injury" (quoting *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*, 151 N.E.2d 833, 835 (N.Y. 1958))).  A fraud claim may be premised on a false promise, but only if the promise is made with a preconceived and undisclosed intention not to perform and is "collateral or extraneous" to any enforceable contract between the parties.  *Int'l CableTel Inc. v. Le Groupe Videotron Ltee*, 978 F.Supp. 483, 486–87 (S.D.N.Y., 1997) (quoting *Graal Enters. Ltd. v. Desourdy Int'l 1949 Inc.*, 1996 WL 353003, at *4 (S.D.N.Y. June 26, 1996)).  Moreover, statements that amount to "little more than mere puffery, opinions of value or future expectations . . . do not constitute actionable fraud." *Elghanian v. Harvey*, 671 N.Y.S.2d 266, 266 (1st Dep't 1998).

A claim for fraud or fraudulent inducement is subject to the particularity pleading requirements of Federal Rule of Civil Procedure 9(b).  *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395, 402–03 (2d Cir. 2015); *see PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 490 (S.D.N.Y. 2017).  Under Rule 9(b), a plaintiff must "(1) detail the statements (or omissions); (2) identify the speaker; (3) state where and when the statements (or omissions) were made; and (4) explain why the statements (or omissions) are fraudulent." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 347 (2d Cir. 1996)).  Allegations that are "conclusory and unsupported by assertions of fact" are not sufficient to meet the Rule 9(b) standard.  *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986).

Plaintiff identifies a number of statements of McCollum which she alleges were fraudulent and induced her to enter into the letter agreement and Marketing and Development Agreement.  Before the letter agreement was signed, McCollum made the following statements:

- In an August 2, 2020, email, McCollum stated: "I love the idea of creating something that can also be used to promote your important work, and I'm intrigued with the Inner MBA."  Dkt. No. 40 at 16; Dkt. No. 40-11 at 1.

- In an August 4, 2020, email, McCollum stated that she believed that Linkage's work "complements yours so beautifully", adding: "You hold the aspiration, the vision, the language and the pictures of Symphony" and Linkage "holds the specific action and support we offer both organizations and leaders, through our research about what drives inclusion and how to measure and develop it to **create** 'Symphony.'"  McCollum added: "I don't think you are planning to build a leadership business, but we might determine if/how we could create digital development that combines our voices and perspectives . . . and we should share the revenue with you."  Dkt. No. 40 at 16–17; Dkt. No. 40-11 at 2.

- In September 2023, McCollum signed the Vision Statement, which envisioned, among other things, that Linkage would be "vocal and visible in our marketing and branding efforts about the collaboration/partnership with Oshoke . . . and we are actively promoting our collective voice and offering."  Dkt. No. 40 at 18; Dkt. No. 40-2.  The vision statement also envisioned that the parties' products would "result[] in a $5M pipeline in 2021" and that "Linkage doubles its Inclusion business to $2M in 2021, on a path to build a $20M by 2023."  *Id.*

- On October 15, 2020, after the parties debuted Superpowers & Symphony, McCollum described "overwhelming positive feedback" and stated that she was suggesting a revenue sharing model rather than a work-for-hire model because "if we are as successful as we hope to be together, it will ensure a much bigger gain for both parties.  Dkt. No. 40 at 17.

Between the signing of the letter agreement in October 2020 and the signing of the Marketing and Development Agreement in June 2022, McCollum made the following statements:

- In a February 15, 2021, handwritten letter, McCollum praised, *inter alia*, Plaintiff's "captivating language" and "poetry in words" and her "commitment to me, to Linkage, and to S+S!"  *Id.* at 19.

- In March 2021, McCollum stated in an email: "I am in complete awe and administration of your focus on the top FIVE (Inner MBA, We Way, S&S, can't remember the other two)!  I noticed in an email from Sounds True that they are recruiting for the next cohort starting in late Sept, and you and Chinedu are listed as faculty, so wanted to make sure you are appropriated [sic] compensated and don't 'give away' your IP/recording, if that is important to you."  *Id.* at 11, 21; Dkt. No. 40-11 at 6.

- In a March 15, 2021, email, McCollum stated that if Linkage was sold in 2023, she wanted to ensure "that the S&S portfolio (including Oshoke, Jen and exec team) have secured all rights to continue with S&S work—with or without Linkage brand." Dkt. No. 40 at 28.

- On March 17, 2021, in response to Plaintiff's request for "clarification surrounding [her] ownership of her intellectual property if Linkage were acquired or sold," McCollum emailed Plaintiff that McCollum wished to "put into place very specific legal agreements that ensure ownership structures that allow **YOU** to have complete freedom with these products, so you and I can continue our work together in a post-Linkage world" and that McCollum wanted the freedom if she exited the company post-sale "to work with you independently under the S&S brand and Solution.  It doesn't mean our Linkage acquirer can't sell/deliver select products as well, but I would want to decide which ones they could use (e.g, Essentials, Assessments, Book) and also ensure through the contracts that you (and eventually I) continue to be protected and paid via the royalties for all the work we've put in, and can continue to sell/deliver whatever we want."  *Id.*

- McCollum compared their relationship to Gloria Steinem and Dorothy Pittman Hughes.  *Id.* at 20; Dkt. No. 40-11 at 4.

Plaintiff alleges that she relied on these statements in agreeing to the Marketing and Development Agreement.  *Id.* at 29–30.

These statements are not legally actionable.  A fraud claim must be based on a "misrepresentation," i.e., a statement that is false.  *Transnat'l Mgmt.*, 2016 WL 7077040, at *5. "[S]ubjective statements of opinion which cannot be proven false" are "non-actionable . . . as a matter of law."  *Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 60 (2d Cir. 2022); *see Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 159 (2d Cir. 2007).  The same is true of predictions, hopes, and expectations.  *See Passiglia v. Northwell Health, Inc.*, 252 F. Supp. 3d 129, 138 (E.D.N.Y. 2017) ("Since the former statement is inherently speculative and does not have any content that may be regarded as true or false, and the latter statement constitutes a mere expression of hope, neither statement provides a basis upon which to predicate a claim for fraud under New York law."); *Karsanow v. Kuehlewein*, 648 N.Y.S.2d 465, 465 (2d Dep't 1996) ("[T]his alleged misrepresentation of fact is no more than an opinion, or prediction of something which is expected to occur in the future, and cannot sustain a claim for fraud."); *George Backer*

*Mgmt. Corp. v. Acme Quilting Co.*, 385 N.E.2d 1062, 1067 (N.Y. 1978) (holding that statement which "did not relate to a concrete fact or a past or existing event" but merely expressed "expectations as to labor agreements which had not yet been negotiated" could not sustain a claim for fraud). A statement that a project is profitable can be proven true or false; a statement that a party hopes the project will be profitable or is excited for the project to be profitable cannot be.

McCollum's statements here fall into the latter category. They do not involve "misrepresentations of existing facts" or false promises about what McCollum would do in the future. *See Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000). Rather, McCollum's statements to Plaintiff express wishes, hopes, or "opinions as to future events." *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994); *see White v. Davidson*, 55 N.Y.S.3d 223, 224 (1st Dep't 2017) (distinguishing between "mere opinion" and "specific misrepresentations" that can sustain a claim for fraud). McCollum's statements that she "loves" and is "intrigued" by Plaintiff's work, is in "awe" of her, or that they will be "successful," Dkt. No. 40 at 11, 16–17, 21, are "immeasurable and subjective" complimentary statements that cannot support a fraud claim, *Int'l Code Council*, 43 F.4th at 60. When McCollum speaks to more specific aspects of the business, she does so in the language of envisioning or hoping for a positive future, rather than stating current facts or making promises about her future actions. The Vision Document by its terms outlines a vision of what the parties want to be "celebrating" in a year's time, not a binding set of promises or representations as to the obligations of each party. Dkt. No. 40-2. It specifically states the parties will come to a later "high-level agreement" to "test/learn a deeper 2021 agreement." *Id.*; *see Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir. 1998) ("Ordinarily, where the parties contemplate further negotiations and the execution of a

formal instrument, a preliminary agreement does not create a binding contract.").  McCollum was not promising Plaintiff a certain share of $20 million in revenue, she was expressing hope that her collaboration with Plaintiff could generate such revenue and that they could share in the benefits.

Similarly, McCollum's statements that she and Plaintiff "might" figure out how to combine their voice and share the revenue, Dkt. No. 40 at 16–17, that she "hope[s]" to be successful together and both make money on a revenue-sharing model, *id.* at 17, and that she wants to "put into place very specific legal agreements that ensure ownership structures that allow **YOU** to have complete freedom with these products, so you and I can continue our work together in a post-Linkage world," *id.* at 28, are conditional expressions of hopes for the future. In these statements, McCollum does not promise Plaintiff a certain revenue share or ownership structure.  Nor did she state she already had certain ownership structures, deals, or collaborations in place, or any other "misrepresentation of a present fact" that would provide grounds for a fraudulent inducement claim.  *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc*., 500 F.3d 171, 184 (2d Cir. 2007).  She simply states what she "hoped or expected to occur in the future," which "will not sustain an action for fraud."  *Zanani v. Savad*, 630 N.Y.S.2d 89, 90 (2d Dep't 1995). Moreover, these hopes and expectations "are not concrete at all," but consist of "vague generalizations."  *President Container Grp. II, LLC v. Systec Corp*., 467 F. Supp. 3d 158, 167 (S.D.N.Y. 2020).  McCollum's statements that she was excited about her work with Plaintiff and their future successes together are not the type of concrete lies or misrepresentations that can support a claim for fraudulent inducement.

Plaintiff argues that McCollum "promised the collaboration would 'determine if/how we could create digital development that combines our voices and perspectives … and we should

share the revenue with you.'" Dkt. No. 23 at 9 (quoting Dkt. No. 40-11 at 2). However, McCollum merely stated that they "might" do this. Dkt. No. 40-11 at 2. The word "might," like the word "may," "connotes discretion" rather than obligation. *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 346 (2005). And in any case, Plaintiff has not adequately pled that this statement or similar statements are untrue. *See Eternity Glob. Master Fund*, 375 F.3d at 187. According to Plaintiff's complaint, the parties did create digital content that combined their intellectual property, and Plaintiff did share in the revenue. Dkt. No. 40-11 ¶ 1(a) ("The parties acknowledge that they have previously and jointly created training materials."); *id.* ¶ 6 (describing the revenue sharing agreement); Dkt. No. 40 at 46 (describing amounts paid).

Plaintiff asserts that even though the parties worked together and shared some revenue, SHRM failed to honor the Agreement to share revenue and respect her intellectual property. Dkt. No. 25 at 9–10. However, if this is true, Plaintiff must seek to collect damages on her breach of contract claim against SHRM. McCollum did not promise Plaintiff a specific share or amount of revenue or specific protections for her intellectual property. These specific promises were made in the letter agreement and Marketing and Development Agreement with SHRM. If McCollum told Plaintiff she wanted to develop a product together and share revenue, and then that actually happened, Plaintiff does not have a claim against McCollum for fraud.

Plaintiff's claim against McCollum must be dismissed.[5]

## II.    Venue

SHRM argues that McCollum's complaint against it should be dismissed for improper venue pursuant to Federal Rule of Civil Procedure 12(b)(3). Dkt. No. 19 at 8. Although SHRM

---

[5] Because McCollum's statements are not actionable and Plaintiff has not adequately alleged that they were false, the Court need not consider McCollum's arguments that Plaintiff has not alleged scienter, reliance, or damages. Dkt. No. 16 at 18–23.

is correct that venue is improper in this District, in the interests of justice the Court will not dismiss the case but instead will transfer it to the Eastern District of New York.

### A.    Venue in the Southern District of New York

Under 28 U.S.C. § 1406(a), a district court shall dismiss (or, in some circumstances, transfer) "a case laying venue in the wrong division or district." 28 U.S.C. § 1406(a). "Rule 12(b)(3) provides the mechanism by which a party can ask a court to do so." *Geffner v. Quanta Servs., Inc.*, 2018 WL 6807388, at *2 (S.D.N.Y. Dec. 27, 2018). "[O]n a motion to dismiss for improper venue pursuant to Rule 12(b)(3), 'the burden of proof lies with the plaintiff to show that venue is proper.'" *Spiciarich v. Mex. Radio Corp.*, 2015 WL 4191532, at *2 (S.D.N.Y. July 10, 2015) (quoting *Cartier v. Micha, Inc.*, 2007 WL 1187188, at *2 (S.D.N.Y. Apr. 20, 2007)). Upon a finding of improper venue, a court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). "It is well established that a plaintiff must establish proper venue for each defendant." *Berall v. Teleflex Med. Inc.*, 2022 WL 2666070, at *3 (S.D.N.Y. July 11, 2022); *accord Sea Tow Servs. Int'l, Inc. v. Pontin*, 472 F. Supp. 2d 349, 363 (E.D.N.Y. 2007) (Bianco, J.).

"A court applies the same standard of review in Rule 12(b)(3) dismissals as Rule 12(b)(2) dismissals for lack of jurisdiction." *Fedele v. Harris*, 18 F. Supp. 3d 309, 316 (E.D.N.Y. 2014). "The court must draw all reasonable inferences and resolve all factual conflicts in favor of the plaintiff." *Concesionaria DHM, S.A. v. Int'l Fin. Corp.*, 307 F. Supp. 2d 553, 555 (S.D.N.Y. 2004) (quoting *E.P.A. ex rel. McKeown v. Port Auth.*, 162 F. Supp. 2d 173, 183 (S.D.N.Y. 2001)). "[I]n deciding a motion to dismiss for improper venue, the 'court may examine facts outside the complaint to determine whether venue is proper.'" *Id.* (quoting *McKeown*, 162 F. Supp. 2d at 183). However, because neither party here has submitted facts outside of the complaint, Plaintiff need only "make a prima facie showing" of venue based on the allegations of

the complaint.  *Fedele*, 18 F. Supp. 3d at 316 (quoting *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d

353, 355 (2d Cir. 2005)).

Section 1391(b) of Title 28 provides in pertinent part:

A civil action may be brought in

(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

(3) if there is no district in which the action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b).

Plaintiff bases her venue argument on Section 1391(b)(2).[6]  Dkt. No. 40 at 13.  Plaintiff

argues that venue is properly laid in New York because her business is based in New York and

she suffered harm here, because Defendants' use of her likeness is on platforms accessible in

New York, and because SHRM is a citizen of any state in the United States.[7]  Dkt. No. 23 at 10.

---

[6] Section 1391(b)(3) is inapplicable here, as this action could clearly be brought in, at a minimum, the Virginia district where SHRM has its principal place of business.  Dkt. No. 40 at 4.  Section 1391(1) is not raised by Plaintiff or briefed by the parties, but in any case does not suggest venue is proper in this District.  Under the venue statute 28 U.S.C. § 1391(c)(2), a defendant corporation such as SHRM is deemed to be a resident of "in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question."  28 U.S.C. § 1391(c)(2).  This definition of residence "essentially equates venue and personal jurisdiction."  Moore's Federal Prac. & Proc. § 110.03[4][b].  Plaintiff suggests that personal jurisdiction exists over SHRM under N.Y. CPLR 302(a)(3) because "SHRM committed acts outside of New York . . . that caused substantial harm to Plaintiff, a New York resident."  Dkt. No. 40 at 14.  But as discussed below, given that Plaintiff is a resident of Brooklyn, this argument would only support personal jurisdiction and venue in the Eastern District.

[7] Plaintiff has cited 28 U.S.C. § 1332(c) for this proposition.  Dkt. No. 23 at 10.  That provision does not make a corporation a citizen of any state, but only any state "by which it has been incorporated" or "the State . . . where it has its principal place of business."  28 U.S.C. §

She alleges that a substantial part of the events or omissions giving rise to the claim occurred in New York because of "[t]he Defendants [sic] substantial contacts with New York, including their use of plaintiff's intellectual property in this district." Dkt. No. 40 at 13. Plaintiff additionally alleges that SHRM "has engaged in substantial and continuous business activities within New York, including maintaining a significant membership base, conducting conferences and events, and marketing its programs to residents of New York," and that "SHRM has actively promoted and monetized Plaintiff's intellectual property, including training programs and materials incorporating Plaintiff's proprietary work, to individuals and entities within New York." *Id.* Finally, she alleges that "SHRM committed acts outside of New York—namely, the unauthorized use of Plaintiff's name, likeness, and intellectual property—that caused substantial harm to Plaintiff, a New York resident." *Id.* at 14. Other than the foregoing allegations and the fact that Plaintiff resides in Brooklyn, New York, Dkt. No. 40 at 2, New York is not mentioned in Plaintiff's complaint.

Plaintiff's allegations do not support venue in the Southern District of New York under Section 1391(b)(2) because Plaintiff does not allege that any events giving rise to the claim are substantially connected to this District. "It is clear that in some cases, the fact that the Plaintiff suffers harm in a particular judicial district is sufficient to satisfy § 1391(b)(2)." *Diaz-Roa v. Hermes L., P.C.*, 2024 WL 4866450, at *24 (S.D.N.Y. Nov. 21, 2024) (quoting *Fedele v. Harris*,

---

1332(c)(1). Moreover, that provision concerns diversity jurisdiction, not venue. Under the venue statute 28 U.S.C. § 1391(c)(2), a defendant corporation such as SHRM is deemed to be a resident of "any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question." 28 U.S.C. § 1391(c)(2). Thus the venue analysis does not look to the few states in which a corporate defendant may be a citizen for purposes of diversity jurisdiction, but allows a corporate defendant to be sued in any district where there is specific or general personal jurisdiction, so long as all other defendants may also be sued there. 28 U.S.C. § 1391(b)(1).

18 F. Supp. 3d 309, 317 (E.D.N.Y. 2014)).  However, Plaintiff lives in Brooklyn, New York, which is in the Eastern District of New York.  Dkt. No. 40 at 2.  The harm she suffered as "a New York resident," *id.* at 14, would therefore suggest venue in the Eastern District of New York, not this District.  The allegations that SHRM generally has members in New York and conducts events in New York also do not support venue under Section 1391(b)(2) because those events do not give rise to Plaintiff's claims.  The events which give rise to Plaintiff's claims are those which support the claims, such as SHRM's use of Plaintiff's trademark, SHRM's continued references to Plaintiff deceiving the public into thinking she is affiliated with SHRM, the formation of the Marketing and Development Agreement and SHRM's breaches of that agreement by misusing the Training Programs and Training Materials and failing to market them, and SHRM's continued use of Plaintiff's name and image in its social media and advertising content.  *See generally* Dkt. No. 40 at 50–72.  Section 1391(b)(2) requires that these events, rather than SHRM's business more generally, substantially occur in the Southern District.

Plaintiff makes two allegations that events relevant to her claims occurred in New York, but these allegations are conclusory.  She alleges that SHRM participated in "use of plaintiff's intellectual property in this district" and "actively promoted and monetized Plaintiff's intellectual property, including training programs and materials incorporating Plaintiff's proprietary work, to individuals and entities within New York."  Dkt. No. 40 at 13.  In general, a claim for trademark infringement is properly venued "where a substantial amount of goods are sold to deceived customers" or "where a defendant advertises and markets the infringing goods."  *Jaguar Cars, Ltd. v. Nat'l Football League*, 886 F. Supp. 335, 338 (S.D.N.Y. 1995); *see Crescent Publ'g Grp. v. Am. Video Corp.*, 1996 WL 143928, at *3 (S.D.N.Y. Mar. 29, 1996); *Knowles-Carter v. Feyonce, Inc.*, 2017 WL 11567528, at *11 (S.D.N.Y. Sept. 23, 2017).  Therefore, if Plaintiff

sufficiently pled that her trademark was used in this District or products including Plaintiff's intellectual property were advertised and marketed to companies in this District, this would support venue in this District.

However, "general and conclusory allegations cannot support a finding of venue under 28 U.S.C. § 1391(b)." *P.C. v. Driscoll*, 2025 WL 104522, at *6 (S.D.N.Y. Jan. 15, 2025); *see Powell v. Monarch Recovery Mgmt., Inc*., 2016 WL 8711210, at *7 (E.D.N.Y. Jan. 22, 2016) (holding that "bare allegation that Defendants transact business in this district" was insufficient to establish venue); *Scott v. Harbeck*, 2024 WL 5470399, at *6 (E.D.N.Y. Nov. 22, 2024) (holding that "bald assertion" was "conclusory and insufficient to establish venue"), *report and recommendation adopted sub nom*. *Scott v. United States*, 2025 WL 836557 (E.D.N.Y. Mar. 17, 2025).  Plaintiff does not plead any facts which would show SHRM used her intellectual property in this District or marketed it to individuals and entities within this District.  She does not plead that any of the replica programs, such as "Redesigning Inclusion: Becoming an Inclusion Champion for the Workforce" and "Redesigning Inclusion: Becoming an Inclusion Champion for Leaders," Dkt. No. 40 at 33–34, were used by individuals or entities in this District, *compare Mola, Inc. v. Kacey Enters., LLC*, 2011 WL 3667505, at *2, *7 (W.D.N.Y. Aug. 21, 2011) (holding that sales in the relevant district of "seven allegedly infringing products worth $1,001" was sufficient to support venue).  She does not plead that SHRM made presentations in or targeted advertisements to this District that included her intellectual property. *Compare Dave Guardala Mouthpieces, Inc. v. Sugal Mouthpieces, Inc*., 779 F. Supp. 335, 337–38 (S.D.N.Y. 1991) (holding that sending advertisements and attempting to sell the infringing product to three specific stores in Manhattan was sufficient to support venue).  Nor does she plead any other facts that would support the conclusion that her intellectual property was used or

marketed in this District.  Plaintiff argues that "SHRM and its subsidiaries, including Linkage, have extensive commercial operations in New York, including using Plaintiff's intellectual property for commercial purposes."  Dkt. No. 51 at 2.  However, the Court may not simply accept as evident or obvious that SHRM has used Plaintiff's intellectual property in this District. Plaintiff must make allegations in her complaint regarding SHRM's clients, advertising, marketing, or other operations in this District and the use of her intellectual property in such activities.

Some of Plaintiff's allegations are additionally insufficient because stating that an event occurred in "New York" does not clarify that it occurred in this District.  *See Gulf Ins. Co.,* 417 F.3d at 357.  "New York State encompasses four judicial districts," and a complaint is insufficient if it does not "unambiguously lay venue" in the relevant district.  *Id.*  Although "New York" is sometimes used to refer to New York County, which is within the Southern District, Plaintiff's complaint frequently uses "New York" to refer to New York State.  *See* Dkt. No. 40 at 14.  Therefore, allegations referencing "New York" do not "unambiguously lay venue" in this District as opposed to, for example, the Eastern District.  *Gulf Ins. Co.,* 417 F.3d at 357.

The Court also may not infer venue in this District from the fact the alleged misuse of Plaintiff's intellectual property occurred online.  According to Plaintiff's complaint, SHRM advertised *Redesigning Inclusion* programs using the Superpowers & Symphony mark and Plaintiff's name on its website, Dkt. No. 40 at 8–9, 44, and posted videos about Superpowers & Symphony which used Plaintiff's likeness on Linkage's Youtube account, *id.* at 41–43.  These websites were publicly available to users in New York, and New York companies could have sought to buy or access the infringing products via these websites.  However, in the related context of personal jurisdiction, courts have held that merely pleading the defendant had a

website "which internet users in New York could access" is not sufficient to make jurisdiction appropriate in New York. *Freeplay Music, Inc. v. Cox Radio, Inc.*, 2005 WL 1500896, at *6 (S.D.N.Y. June 23, 2005); *see Blockchange Ventures I GP, LLC. v. Blockchange, Inc.*, 2021 WL 308277, at *2 (S.D.N.Y. Jan. 29, 2021) ("[T]he mere accessibility of Defendant's website and its use of cookies is insufficient to constitute transacting business in New York.") *Creative Photographers, Inc. v. Grupo Televisa, S.A.B.*, 2025 WL 388401, at *9 (S.D.N.Y. Feb. 4, 2025). The same conclusion is sensibly applied to venue under 28 U.S.C. § 1391, given that the requirement that a "substantial part" of the events occur in the district is in relevant ways higher than the jurisdictional requirement of "minimum contacts." *See Gulf Ins. Co.*, 417 F.3d at 357 (cautioning district courts to "take seriously the adjective 'substantial.'"). If, for example, a website created and maintained in Germany sells an infringing product in Germany, venue would not be appropriate in the Southern District simply because the website was accessible here. *Cf. Cuccioli v. Jekyll & Hyde Neue Metropol Bremen Theater Produktion GmbH & Co.*, 150 F. Supp. 2d 566, 576 (S.D.N.Y. 2001).

Rather, a Plaintiff must plead facts showing that commercial activity in this District "actually occurred or was actively sought." *Freeplay Music*, 2005 WL 1500896, at *6. As discussed above, Plaintiff might plead that through the website the infringing products reached companies or audiences in this District or that SHRM targeted audiences or markets in this District. But she has not. Absent any allegations of this type, the mere fact that the infringement occurred on publicly available websites is not sufficient to support venue in this District.

## B.    Transfer of Venue

Plaintiff suggests that if the Court determines that venue is improper, it should transfer the case to the appropriate venue. Dkt. No. 23 at 12. Although SHRM requests that the Court instead dismiss the case, Dkt. No. 19 at 10, it has stated multiple times that the Eastern District of

New York is an appropriate venue for this action, *see id.* ("Plaintiff could have filed . . . this action in the Eastern District"); Dkt. No. 48 at 13:14–25 (describing the Eastern District as "the most logical spot for this case to be venued").  Therefore, in the interest of justice, the Court will transfer this case to the Eastern District.

"The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."  28 U.S.C. 1406(a).  The purpose of the transfer provision is to "eliminate impediments to the timely disposition of cases and controversies on their merits."  *Minnette v. Time Warner*, 997 F.2d 1023, 1027 (2d Cir. 1993).  In keeping with this purpose, "[i]n most cases of improper venue, the courts conclude that it is in the interest of justice to transfer to a proper forum rather than to dismiss the litigation."  Charles Alan Wright & Arthur R. Miller, 14D Fed. Prac. & Proc. Juris. § 3827 (4th ed. 2024); *see Smart v. Goord*, 21 F. Supp. 2d 309 (S.D.N.Y. 1998) ("[I]f venue were improper, a transfer to a proper forum would be preferable to dismissal.").  This is especially true when Plaintiff's filing in an improper venue was in good faith and transfer would be "efficient and economical."  Wright & Miller, 14D Fed. Prac. & Proc. Juris. § 3827; *see Williams v. Nathan*, 897 F. Supp. 72, 77 (E.D.N.Y. 1995), *aff'd*, 101 F.3d 687 (2d Cir. 1996).

Here, the interests of justice favor transfer rather than dismissal.  There is no indication that Plaintiff's claims were made in bad faith, and the principle of "eliminat[ing] impediments to the timely disposition of cases" indisputably favors transferring the case rather than forcing *pro se* Plaintiff to refile in a new district.  *Minnette*, 997 F.2d at 1027.  Transfer is especially appropriate given that the primary district defendants have suggested for transfer is the Eastern District.  Plaintiff resides in the Eastern District, and it is a logical and convenient place for her

28

to litigate this case *pro se*.  Plaintiff has not contested SHRM's repeated representations that this case could have been brought in the Eastern District.  Under these circumstances, transfer to the Eastern District of New York is clearly in the interest of justice.[8]

SHRM argues that the case should be dismissed rather than transferred because Plaintiff has not stated a claim against it under Rule 12(b)(6).  Dkt. No. 19 at 10.  But "[a]s the Court finds that transfer is appropriate, it defers decision on the Defendants' motion to dismiss for failure to state a claim to allow the transferee court an opportunity to consider the merits of the case." *Brown v. New York*, 947 F. Supp. 2d 317, 326 (E.D.N.Y. 2013); *see Schweitzer v. Nevels*, 669 F. Supp. 3d 242, 246 (S.D.N.Y. 2023); *Enigma Software Grp. USA, LLC v. Malwarebytes Inc.*, 260 F. Supp. 3d 401, 413 (S.D.N.Y. 2017).

---

[8] The transfer of venue statute additionally requires that the transfer be to a "district or division in which [the case] could have been brought." 28 U.S.C. 1406(a).  This means that "subject matter jurisdiction, personal jurisdiction, and venue would have had to have been proper in the transferee court at the time the action was filed.*" Ivy Soc'y Sports Grp., LLC v. Baloncesto Superior Nacional*, 2009 WL 2252116, at *3 (S.D.N.Y. July 28, 2009).  Subject-matter jurisdiction exists because Plaintiff's trademark claim arises under federal law.  Dkt. No. 40 at 22.  No party has contested that personal jurisdiction and venue would also exist in the Eastern District, and the Court does not have a *sua sponte* duty to address these issues when they are not raised by the parties.  *See Tlapanco v. Elges*, 2017 WL 4329789, at *4–7 (S.D.N.Y. Sept. 14, 2017).  Regardless, this is clearly not a case in which the defendant seeks to manipulate the transfer of venue statute to move the case to a forum with no connection to the action.  *See Hoffman v. Blaski*, 363 U.S. 335, 344 (1960).  Plaintiff is domiciled in the Eastern District and suggests personal jurisdiction (and thus venue) is proper because of the harm she has suffered in that District.  Dkt. No. 40 at 14; *see Gucci Am., Inc. v. Frontline Processing Corp.*, 721 F. Supp. 2d 228, 241 (S.D.N.Y. 2010) (holding that "an allegation of trademark infringement by a New York-based corporate plaintiff that alleges harm in New York" satisfied CPLR 302(a)(3)(ii)).  She also likely participated in contract negotiations and performed obligations under the contract from the Eastern District.  *See Edward Roberts, LLC v. Ind. Econ. Dev. Corp.*, 2022 WL 17492467, at *4 (E.D.N.Y. Nov. 21, 2022) (noting that the locations a contract is negotiated and performed are relevant to a breach of contract claim).  SHRM, which is based in Virginia, does not derive any obvious benefit from venue in the Eastern District.  The Court has no cause to question SHRM's representation that the Eastern District is "the most logical spot for this case to be venued," given that Plaintiff has not objected to this venue and it appears consistent with the allegations in her complaint.  Dkt. No. 48 at 13:14–25.

## CONCLUSION

McCollum's motion to dismiss is GRANTED.  SHRM's motion to dismiss is DENIED.

Because venue over Plaintiff's claims against SHRM is improper in this District, the Court transfers this case to the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 1406(a).

The Clerk of Court is respectfully directed to close Dkt. Nos. 15 and 17.

SO ORDERED.

Dated: April 4, 2025
       New York, New York

_____
LEWIS J. LIMAN
United States District Judge